In Coke Upon Littleton, Vol. 2, Chap. 6, Sec. 399, Lord Coke had pronounced the following:
 "By the common law if the husband be within the foure seas, that is within the jurisdiction of the King of England if the wife hath issue, no proofe is to be admitted to prove the childe a bastard . . ."
(Emphasis added.)
Today, the majority reapplies Lord Coke's rule, even though this Court, almost one hundred years ago, described the old restrictive rule as "exploded:"
 "The ancient common-law authorities declared the issue of every married woman to be legitimate, except in the two special cases of the impotency of the husband and his absence from the realm. . . . The inference is excluded that the charge of illegitimacy rests either upon the impotency of the husband or upon the impossibility of his access to the wife during the period when she became pregnant. If the rule above stated prevails, the particular case alleged in the bill is not one in which the law permits the presumption of legitimacy to be disputed, and Ben Knox must be treated as the son of his mother's husband. But that rule has long since been exploded. It operated in many cases to make a man, in law, the father of children who were obviously not his in fact. The rule was first relaxed by permitting the conclusion of illegitimacy to be drawn in certain other special classes of cases in which legitimacy was impossible. It was seen that there were other cases, not included in the common-law classification, in which it was impossible that the husband could be the father of a child born of his wife during their marriage. Finally, the simple rule was recognized that a child is a bastard, though born, or begotten and born, during marriage, when it is impossible that its mother's husband could have been its father; and that every species of legal evidence tending to this conclusion is admissible on the trial of the issue as to its legitimacy. The question of legitimacy is simply one of fact. The modern authorities sustain the propositions, that the presumption of legitimacy from the birth of a child during marriage may be rebutted by evidence which clearly and conclusively shows that the procreation by the husband was impossible; and that it is competent to show that, according to the course of nature, the husband could not be the father of the child. . . ." Bullock v. Knox, 96 Ala. 195, 11 So. 339 (1892).
By 1938 this Court could unhesitatingly declare that:
 "It has long been established that the presumption of legitimacy from marriage may be rebutted." (Emphasis Added). McCrary v. Matthews, 234 Ala. 409, 179 So. 367 (1938).
In 1950, this Court held in the case of Butler v. Butler,254 Ala. 375, 48 So.2d 318 (1950), that the presumption of legitimacy is not conclusive:
 "It is without dispute that the children were born during the wedlock of Marie Butler and Sam Butler. This accordingly raises a presumption of legitimacy. This presumption, however, is not conclusive."
(Emphasis added.)
The well established rule now fully evolved was pronounced again in 1953 in *Page 715 
the case of Jackson v. Jackson, 259 Ala. 267, 66 So.2d 745
(1953):
 "Without dispute, the infant here involved was born during the wedlock of Jessie Lee Jackson and Annie Maude Jackson. This, accordingly, raises a presumption of legitimacy. This presumption, however, is not conclusive." (Emphasis added.)
The case of Carnegie v. Carnegie, 261 Ala. 146, 73 So.2d 556,557 (1954), stated the rule as follows:
 "When a child is born in wedlock the law raises a rebuttable presumption of its legitimacy." (Emphasis added.)
In Arthur v. Arthur, 262 Ala. 126, 77 So.2d 477 (1955), this Court quoted with approval the following rule as pronounced in 10 C.J.S. Bastards § 3, p. 18:
 "The policy of the law is to confer legitimacy upon children born in wedlock when access of the husband at the time of conception was not impossible, and there is a presumption that a child so born is the child of the husband and is legitimate, even though the wife was guilty of infidelity during the possible period of conception. In general, however, the presumption is not conclusive in the first instance and is rebuttable.
 "So firm was this presumption originally that it could not be rebutted unless the husband was incapable of procreation or was absent beyond the four seas, that is, absent from the realm, during the whole period of the wife's pregnancy. This strict rule was, however, relaxed and eventually repudiated, or at least greatly modified, and gave way to the modern doctrine that the presumption may be rebutted by competent and relevant evidence showing that the husband could not have been the father of the child . . ." (Emphasis added.)
Thus we see there is no legal objection to testimony on the ground that it tends to "bastardize" or make the plaintiff children "illegitimate." To the contrary, every species of legal evidence tending to the conclusion of legitimacy is admissible on the trial of such issue. The question of legitimacy is one of fact, and the presumption of legitimacy may be rebutted by relevant evidence.
The majority admits that the term "bastard" in Alabama's Legitimation of Children Statute (Title 27, § 11, Code, 1940, Recomp. 1958, now, § 26-11-2, Code, 1975) applies not only to a child born out of wedlock but also to a child born in wedlock but sired by a man who was not the mother's husband. The reputed natural father, Leonard, took every step required by law to "legitimate" these children, and the evidence here, a great deal of which the court would not admit, was overwhelming to rebut any presumption that these children were sired by Leroy Wilcox. A summary of that evidence showed:
 1. Carl Leonard complied in every respect and formality with the statutory requirements of Title 27, Section 11, Code of Alabama, 1940, Recomp. 1958, to legitimate the children.
 2. Darcus Wilcox testified that she had not seen Leroy Wilcox since 1947.
The trial judge refused to allow evidence on the following factual points:
1. Written and oral statements by Carl Leonard that he is the natural father of the plaintiff children.
2. That Carl Leonard was living in the same household with plaintiff children's mother, Darcus Wilcox, at the time of the conception of Luther Warren Leonard.
3. That Carl Leonard paid the rent on the house inhabited by plaintiff children and their mother.
4. That it is the general reputation in the community where the plaintiff children and their mother live that Carl Leonard is the natural father of the plaintiff children.
5. That defendant widow, Bernice Leonard, has introduced the plaintiff children to her relatives as belonging to Carl Leonard.
6. That defendant widow testified under oath in a court of law that Darcus Wilcox was having children by her husband, Carl Leonard.
7. That plaintiff children visited with Carl Leonard at his home. *Page 716 
8. That plaintiff children visited with Carl Leonard at the hospital during his last illness.
9. That Carl Leonard gave the plaintiff children money and change from time to time for their own spending.
10. That plaintiff children called Carl Leonard "Daddy."
11. That defendant widow, Bernice Leonard, has admitted to a third party that Carl Leonard is the natural father of plaintiff children.
12. That Leroy Wilcox, the husband of Darcus Wilcox, who lived in Georgia, never even saw their second son who was born in 1948 and who was burned to death at age five.
13. That Darcus Wilcox, the plaintiff children's mother, had a normal nine-month gestation period with each of the plaintiff children.
14. That plaintiff children were uniformly received in society and acknowledged by the family of Darcus Wilcox as the children of Carl Leonard.
15. That Carl Leonard was in the presence of Darcus Wilcox when she gave birth to one or more of the plaintiff children.
16. That Carl Leonard went after and brought back the midwife that delivered one of the plaintiff children.
17. That there is a specific point of resemblance physically between the four plaintiff children and Carl Leonard.
18. That Darcus Wilcox, plaintiff children's mother, had sexual intercourse with Carl Leonard approximately nine months prior to the birth of each of plaintiff children.
19. That Carl Leonard lived with Darcus Wilcox, the mother of the four plaintiff children, in her house at a time preceding the birth of each of the plaintiff children by approximately nine months.
20. That Carl Leonard ate his meals with Darcus Wilcox in her home from 1952 until after the birth of the youngest plaintiff child.
21. That Carl Leonard bought groceries for Darcus Wilcox and the four plaintiff children between the years 1952 and 1969.
22. That Carl Leonard bought clothes and gave them to the four plaintiff children.
23. That Carl Leonard paid the rent on the home in which Darcus Wilcox and the four plaintiff children resided.
24. That it is the general reputation in the family of Carl Leonard that plaintiff children were born illegitimate.
25. That no other male has had access to the body of Darcus Wilcox other than Carl Leonard since January 1, 1952.
26. That Carl Leonard referred to the four plaintiff children in speaking to them as "my children."
I am quite aware of the presumption of legitimacy conferred on children born to a married woman, but the evidence is simply overwhelming here that Leroy Wilcox was neither the reputed nor natural father of these children. Consequently, I dissent.
ALMON and EMBRY, JJ., concur.